UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| John F. Drew,<br>    *Plaintiff,*<br><br>    v.<br><br>City of Groton, *et al.*,<br>    *Defendants.* | Civil No. 3:09cv1355 (JBA)<br><br><br>July 21, 2011 |

RULING ON MOTION FOR SUMMARY JUDGMENT

On October 6, 2010, Plaintiff John Drew filed a Second Amended Complaint claiming that Defendant Brian Connolly, the City of Groton ("City"), and Groton Chief of Police Bruno L. Giulini subjected Drew to a false arrest and unlawful detention in violation of his Fourth and Fourteenth Amendment Rights. Defendants now move [Doc. # 62] for summary judgment on all of Plaintiffs' claims. For the reasons stated below, Defendants' Motion for Summary Judgment will be granted in part and denied in part.

I.  Material Facts

    A.  Traffic Stop

According to his deposition testimony, Plaintiff spent the evening of July 26, 2008 at Danno's Café on Poquonnock Road in Groton with his girlfriend Linda Graser and other friends. (Drew Dep., Ex. B to Defs.' Rule 56(a)1 Smt. at 22:7–30:3.) Drew testified that he had "one sip" of beer at Danno's and that Graser had a single Tom Collins. (*Id.* at 23:13–24:12.) He also stated in his December 9, 2010 affidavit that the one sip of beer was the only alcohol he drank that day and that he was not under the influence of any drugs or alcohol. (Drew Aff., Ex. 1 to Pl.'s Rule 56(a)2 Stmt. ¶ 1.) Drew further averred that he left Danno's at about 10:22 p.m. with Graser. (*Id.* ¶ 2.) According to Drew, he drove on

Poquonnock Road from Danno's to the intersection with Mitchell Street, at which point he waited for a fire truck with its sirens on to pass and then turned right onto Mitchell. (Drew Dep. at 40:10–19; Drew Aff. ¶¶ 2–3.) After Drew turned onto Mitchell Street, Graser noticed a police cruiser behind their truck and, believing that the cruiser was traveling with the fire truck, Drew signaled and veered to the right to allow the cruiser to pass. (Drew Dep. at 40:20–41:5; Drew Aff. ¶ 3.) When the cruiser did not pass them, Drew signaled left, reentered the traffic lane, and after stopping at a stop sign at the intersection of Allen Street and Smith Street, turned left onto Smith Street. (Drew Dep. at 41:5–49:19; Drew Aff. ¶¶ 3–4.) After Drew turned onto Smith Street, the cruiser turned its lights on and Drew pulled his truck over to the right of the road. (Drew Dep. at 48:13–51:5; Drew Aff. ¶ 4.) Drew states in his affidavit: "I had my signals on for every turn I made and at no point did I cross over a double yellow line nor did the vehicle ride up on any curb," and testified similarly during his deposition. (Drew Dep. at 51:6–18; Drew Aff. ¶ 5.)

Defendant Officer Brian Connolly of the City of Groton Police Department testified during his August 6, 2010 deposition and explained in his Incident Report that at approximately 10:20 p.m. on July 26, 2008, he was traveling west on Poqounnock Street and was directly behind Drew's truck at the intersection with Mitchell Street when the fire truck passed. (Incident Report, Ex. A to Defs.' Rule 56(a)1 Stmt. at 1; Connolly Dep., Ex. D to Defs.' Rule 56(a)1 Stmt. at 23:16–24:22.) Connolly followed Drew onto Mitchell Street and stated in the Incident Report and his deposition that he paced Drew's rate of speed at 22 miles per hour, that the posted speed limit on Mitchell is 30 miles per hour, and the average flow of traffic is probably 40 miles per hour. (Incident Report at 1; Connolly Dep. at 25:4–8.) Connolly claims in the Incident Report that Drew then "suddenly" turned left on Allen

Street without signaling and "cut the corner very sharply crossing into the eastbound lane/double yellow line of Allen by several feet." (Incident Report at 1.) He further claims that Drew turned right onto Smith Street and as the truck turned "its rear passenger side tire traveled over the corner/sidewalk, by approximately 8–10 inches." (*Id.*) He then "performed a traffic stop on Smith Street." (*Id.*)

Officer Connolly wrote in the Incident Report that after approaching the truck he "detected an odor of an alcoholic beverage coming from the vehicle" and asked Drew and Graser if they had been drinking to which Drew responded he had "one shot with dinner then said only one beer" and Graser responded "they had [a] couple of drinks a while ago with dinner." (*Id.*) During his deposition, Connolly similarly testified that Drew at one point told him that he had a shot and at another point told Connolly he had a beer. (Connolly Dep. 48:6–14.) Drew testified, however, that he told Officer Connolly that he had "a sip of beer" and did not tell Connolly that he had a shot. (Drew Dep. at 52:14–53:2.)

Connolly continues in the Incident Report that he asked Drew for his license and registration and that Drew handed him his license and two registrations along with his emissions forms. (Incident Report at 1.) Drew testified that he handed Connolly "the paperwork" from his glove compartment, which included the bill of sale, and that Connolly "threw it back" at him and said "[t]his paperwork is incorrect." (Drew Dep. at 54:3–20.) Connolly denies having thrown the paperwork at Drew. (Connolly Dep. at 44:2–6.) Officer Connolly states in the Incident Report that when he asked Drew questions, Graser "talked over him and answered all the questions." (Incident Report at 1.) Connolly then asked Drew to exit the truck and Drew complied. (Incident Report at 1; Drew Dep. at 54:24–55:3; Connolly Dep. at 52:10–12.) Connolly testified that he observed signs that Drew may have

3

been impaired and that he informed Drew that he "was concerned about him driving while impaired." (Connolly Dep. 49:6–52:19.) Plaintiff's Expert Peter Plante, a police officer for 25 years, states in an affidavit that Connolly "did not have sufficient grounds to ask plaintiff to exit the motor vehicle" because Connolly never states that Drew had glassy or bloodshot eyes, flushed face, slowed or mumbled speech or an inability to understand instructions, or a combative disposition. (Plante Aff., Ex. 3 to Pl.'s Rule 56(a)2 Stmt. ¶ 7.)

### B. Field Sobriety Tests

After Drew stepped out of the truck, Officer Connolly asked him if he would submit to field sobriety tests and Drew consented. (Incident Report at 1; Connolly Dep. at 52:20–24.) Drew testified that Connolly first asked him to touch his nose, however Officer Connolly testified that he did not, at any time, ask Drew to touch his nose. (Drew Dep. at 59:3–7; Connolly Dep. at 53:7–9.) Officer Connolly testified that the first field sobriety test that he conducted was the horizontal gaze Nystagmus test. (Connolly Dep. at 53:3–6.) In conducting that test, Connolly asked Drew he if wore contacts or glasses, to which Drew responded that he did not; Connolly then asked Drew to follow with his eyes a pen that Connolly held 10 to 12 inches from Drew's face and moved from Drew's left to his right. (Incident Report at 1–2; Connolly Dep. at 53:3–54:7; Drew Dep. at 59:7–17.) Connolly wrote in the Incident Report that Drew moved his head to follow the pen, once moved his head in the opposite direction of the pen, did not have "smooth pursuit" in his eyes, and had "distinct jerkiness at maximum deviation, in his left eye." (Incident Report at 2.) Connolly explained at his deposition that are six clues that officers look for in conducting the test and "it is the failing point" if they observe four; Drew displayed three of the clues. (Connolly Dep. at 53:12–57:25.)

Defendants' Expert Danny West testified at his deposition that if an officer observes four or more clues then there is a 77% probability that an individual's blood alcohol content ("BAC") is above the legal limit of 0.08%. (West Dep., Ex. M to Defs.' Rule 56(a)1 Stmt. at 82:10–18.) Plante states in his affidavit that according to Connolly's deposition testimony, Connolly did not properly administer the horizontal Nystagmus test and despite Connolly's incorrect instructions, Drew actually passed the test. (Plante Aff. ¶ 8.) On the arrest form, Connolly did not check off any of the boxes that correspond to the horizontal Nystagmus test. (Arrest Form, Ex. 4 to Pl.'s 56(a)2 Stmt. at 1.)

Officer Connolly then conducted the "walk–and–turn" test by asking Drew to keep his hands at his sides and stand with his right foot in front of his left foot, take a series of nine small steps heel to toe, and then turn around and return using the same series of steps. (Incident Report at 2; Connolly Dep. at 65:17–68:18.) According to Connolly, Drew was unable to keep his right foot straight while standing in the starting position, was unable to properly count his steps, missed the heel–to–toe three times, raised his arms once to regain balance, and returned without turning around by walking backwards without touching heel to toe. (Incident Report at 2; Connolly Dep. at 67:5–69:17.) Connolly testified that this meant that Drew "failed the test." (Connolly Dep. at 69:18–19.) Plante states in his affidavit, however, that "Officer Connolly incorrectly conducted the walk and turn test and incorrectly provided the plaintiff with instructions as to how to walk and turn."

Officer Connolly then proceeded to the next test: the "one–leg–stand." (Connolly Dep. at 71:19–72:1.) Connolly testified that he checked to make sure that Drew did not have any disabilities and then asked Drew to stand with his hands at his sides and raise one foot approximately six inches in the air while keeping his legs straight and toe pointed, looking

at his toe, and counting out loud until Connolly asked him to stop. (*Id.* at 72:2–20.) According to Connolly, Drew swayed while he gave the instructions and although he counted properly, he could not raise his leg without bending it and had to put his foot down for balance. (*Id.* at 72:23–74:11; Incident Report at 2.) Drew demonstrated three of four clues that would suggest impairment, and because two demonstrated failure, he failed this test. (Connolly Dep. at 74:12–75:21.)

Despite Connolly's account of the sobriety tests, Drew maintains that he passed all three tests he was given. (Drew Aff. ¶ 7.)

C. Drew's Arrest

Officer Connolly reported that "[b]ased on the results of the Field Sobriety Tests, the smell of alcoholic beverage, [Drew's] admitting to consuming alcohol just prior to driving on a public road, [and] his erratic/improper driving" he believed he had probable cause to arrest Drew for driving while under the influence of alcohol. (Incident Report at 2.) He continued that "Drew was handcuffed behind his back, using two pairs of handcuffs for his comfort" and "was transported to the Groton City Police Department, where he was processed." (*Id.*)

Drew says that after Connolly handcuffed him "he hit the cuffs and it caused my wrists to swell and get black–and–blue." (Drew Dep. at 61:11–12.) He stated that Connolly then asked him if he did drugs, if he wanted to kill himself, and if he wanted to kill Connolly. (*Id.* at 55:9–23.) Drew further testified that the officer that then drove him to the Police Department asked him if he was drinking, if he was on drugs, if he wanted to kill himself, and if he was hearing voices in his head, and Drew "just stopped talking" in response. (*Id.*

6

at 70:12–71:23.) He claims that the officers were "trying to provoke [him] . . . [b]y asking stupid questions." (*Id.* at 71:4–6.)

      D.      Further Testing

At the Police Department, Officer Connolly asked Drew if he would submit to a Breathalyzer test, and Drew consented. (Incident Report at 3; Drew Dep. at 74:15–22; Connolly Dep. at 91:12–16.) The result of the Breathalyzer test was 0.000% BAC. (Incident Report at 3; Connolly Dep. at 92:16–17.) Connolly then asked Drew to undergo a urine test and Drew agreed. (Connolly Dep. at 94:19–23.) The lab report for Drew's urine test issued on September 5, 2008 and revealed that no drugs or metabolites were detected in Drew's urine sample. (Lab Report, Ex. E to Defs.' 56(a)1 Stmt. at 1.)

      E.      Booking/Release

Defendant Bruno L. Giulini, Groton Chief of Police, testified during his October 4, 2010 deposition that because Drew was arrested for drunk driving, the Police seized his driver's license. (Giulini Dep., Ex. F to Defs.' Rule 56(a)1 Stmt. at 36:24–37:10.) Drew did not receive his license back until five days later, on August 1, 2008, although Giulini testified that he could have retrieved it twenty–four hours after his arrest. (*Id.* at 38:16–23.) According to Giulini, Drew was not advised by any document that he could have picked up his license twenty–four hours later. (*Id.* at 38:24–39:2.) Giulini also testified during his deposition that under the City of Groton's policies and procedures, a twenty–four–hour seizure of an individual's driver's license shall only occur if that person has a BAC of .1 or higher or that person refuses chemical tests, neither of which applied to Drew. (*Id.* at 37:11–38:2.)

Drew was booked at approximately 10:50 p.m., placed in a holding cell, and released on a $500 non–surety bond at 12:10 a.m. on July 27, 2008. (Drew Dep. at 77:19–23; Arrest Report, Ex. L to Defs.' Rule 56(a)1 Stmt.)

II.  Discussion[1]

   A.  Reasonable Suspicion to Stop Drew's Vehicle

Defendants argue that they are entitled to summary judgment on Drew's claim in Count One of the Second Amended Complaint that Officer Connolly violated his Fourth Amendment rights by forcing Drew to exit his vehicle and submit to sobriety tests without reasonable suspicion because it is undisputed, based on the totality of the circumstances, that Connolly had reasonable suspicion to both stop Drew's vehicle and to test his sobriety. (Mem. Supp. [Doc. # 62–1] at 16–18.)

"The temporary detention of an individual during a traffic stop is subject to limitation under the Fourth Amendment as a 'seizure' of the person." *Holeman v. City of New London*, 425 F.3d 184, 189 (2d Cir. 2005) (citing *Whren v. United States*, 517 U.S. 806, 809–10 (1996)). Under the Fourth Amendment, a law enforcement officer may "stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" *United States v. Sokolow*,

---

[1] "Summary judgment is appropriate where, construing all evidence in the light most favorable to the non-moving party," *Pabon v. Wright*, 459 F.3d 241, 247 (2d Cir. 2006), "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(c)(2). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Unsupported allegations do not create a material issue of fact." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

490 U.S. 1, 7 (1989). In making a determination on reasonable suspicion, the Court must look at the "totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing," drawing on his or her "own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotations and citations omitted).

Defendants argue that "based on his personal observations of the plaintiff failing to use his turn signal, crossing the double yellow line, and driving up onto the curb when making a turn, Officer Connolly had reasonable suspicion to stop the plaintiff's vehicle." However, even though Officer Connolly included these facts in his Incident Report and testified to each of those observations in his deposition, these facts are not undisputed. Drew's account of the traffic stop refutes the observations that Defendants use as a basis for reasonable suspicion. Drew and Graser both state in their affidavits that at no point did the rear wheel of Drew's truck drive over the curb and that Drew used his signals for every turn he made. (Drew Aff. ¶¶ 5, 9; Graser Aff., Ex. 2 to Pl.'s Rule 56(a)2 Stmt. ¶ 4.) Drew similarly avers that at no point did his truck cross over a double yellow line. (Drew Aff. ¶ 5.)

This leaves as the only undisputed fact upon which Connolly based his decision to stop Drew's vehicle that Drew was driving approximately twenty–two miles per hour for some period of time in a thirty mile–per–hour zone. Defendants argue in their Reply that Drew's slow rate of speed alone was sufficient grounds for reasonable suspicion (Reply [Doc. # 68] at 4–5), however, the cases upon which they rely do not support this proposition. In *State v. Jensen*, 109 Conn. App. 617, 625–26 (2008), the Connecticut Appellate Court held that where police officers observed the defendant "driving very slowly and even stopping

9

momentarily at a green traffic signal" in corroboration of a report that an individual driving that same make and model vehicle was driving erratically, the officers had reasonable suspicion to stop the defendant. In *State v. Franco*, No. MV–503054, 1991 WL 112359, *2 (Conn. Super. Ct. June 11, 1991), "[t]he defendant's slow speed and mode of operation of his vehicle, including braking at relatively easy turns and being overly cautious, led Sergeant Mrozek, based on training and experience, to suspect that the defendant might be operating under the influence." In each of these cases, the arresting officers based their suspicion of wrongdoing on more than just driving several miles per hour below the speed limit; they based their reasonable inferences on other observations of erratic or overly cautious driving.

Based on the only undisputed fact—Drew's slow rate of speed—Defendants do not establish that they are entitled to judgment as a matter of law on the issue of whether Connolly had reasonable suspicion to stop Drew's vehicle. If a jury credited Connolly's account of Drew's driving, there may have been reasonable suspicion to stop Drew, but if a jury credited Drew's account, there would not have been. These conflicting accounts of the facts that would be taken into account in the reasonable suspicion analysis make summary judgment inappropriate on Drew's claim that Connolly lacked reasonable suspicion to stop his vehicle. *See Clynch v. Chapman*, 285 F. Supp. 2d 213, 224–25 (D. Conn. 2003).

The conflicting accounts of Drew's conduct following the traffic stop likewise preclude summary judgment on the issue of whether Connolly had reasonable suspicion to order Drew to exit his truck. Connolly claims that he smelled alcohol from Drew's truck, that Drew handed him the wrong paperwork, and that Drew told Connnolly that he drank one beer or one shot earlier in the night. Drew, however, claims that he handed Connolly

the correct paperwork and that he told Connolly that he had only had one sip of beer that night.

Because a reasonable jury could return a verdict for Drew based on his and Graser's account of the events leading up to Connolly's decision to stop Drew's vehicle and ask him to exit and submit to sobriety tests, Defendants' motion for summary judgment on Drew's claim that Connolly violated his Fourth Amendment rights by stopping his vehicle and forcing him to submit to sobriety tests is denied.

B.  Probable Cause for Drew's Arrest

Defendants argue that they are entitled to summary judgment on Drew's claim in Count One of the Second Amended Complaint that Officer Connolly violated his Fourth Amendment rights by placing him under arrest without probable cause because, based on the undisputed facts, Drew's performance on the field sobriety tests in connection with the circumstances of the traffic stop were sufficient to establish probable cause for the arrest. (Mem. Supp. at 20–22.)

In order to succeed on a false arrest claim, a plaintiff must establish that "(1) the defendant intentionally arrested him or had him arrested; (2) the plaintiff was aware of the arrest; (3) there was no consent to the arrest; and (4) the arrest was not supported by probable cause." *Shattuck v. Town of Stratford*, 233 F. Supp. 2d 301, 306 (D. Conn. 2002). "The existence of probable cause is a complete defense to a false arrest claim." *Weinstock v. Wilk*, 296 F. Supp. 2d 241, 247 (D. Conn. 2003). Probable cause to arrest exists where an Officer has "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (citations omitted).

"Whether probable cause existed is a question that may be resolved as a matter of law on a motion for summary judgment if there is no dispute with regard to the pertinent events and knowledge of the officer." *Wilk*, 296 F. Supp. 2d at 246 (citing *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 2003)).

As with the facts upon which Connolly based his decision to stop Drew's vehicle, there are disputes "with respect to the pertinent events and knowledge" of Officer Connolly in concluding that he had probable cause to arrest Drew for driving while under the influence of alcohol. Officer Connolly stated in his Incident Report that he believed he had probable cause to arrest Drew "[b]ased on the results of the Field Sobriety Tests, the smell of alcoholic beverage, [Drew's] admitting to consuming alcohol just prior to driving on a public road, [and] his erratic/improper driving." (Incident Report at 2.) He asserts that he detected the scent of alcohol in Drew's truck and that Drew at one point said he had a shot with dinner and later said that he had one beer. (*Id.* at 1.) Drew, however, claims that he only told Connolly that he had one sip of beer with dinner. (Drew Dep. at 52:14–53:2.) Connolly did not state in his Incident Report or during his deposition that Drew had glassy or bloodshot eyes, a flushed face, slurred speech, an inability to understand instructions, or a combative disposition. (*See* Plante Aff. ¶ 7.) As discussed above, Drew and Connolly offer contradictory accounts of Drew's driving and whether or not it was erratic and/or improper.

Officer Connolly conducted field sobriety tests and stated that although Drew was not at "the failing point" for the horizontal gaze Nystagmus test, he failed the walk–and–turn test because he could not keep his right foot straight, could not properly count his steps or walk heel–to–toe, raised his arms to regain balance, and did not turn around to walk back to Connolly heel–to–toe as instructed, but instead returned by walking backwards.

(Incident Report at 2; Connolly Dep. at 53:6–69:19.) Drew maintains that during the walk–and–turn test, he "was asked to walk forward and backwards which I did." (Drew Aff. ¶ 7.) Connolly also stated that Drew failed the one–leg–stand test because he swayed while standing still, could not raise his leg without bending it, and had to put his foot down for balance. (Incident Report at 2; Connolly Dep. at 72:23–74:11.) Drew's expert, Peter Plante, maintains that Officer Connolly did not properly administer the horizontal Nystagmus test, "incorrectly conducted the walk and turn test and incorrectly provided the plaintiff with instructions as to how to walk and turn," and that "[t]he field sobriety tests performed were not performed adequately." (Plante Aff. ¶¶ 8–10.)

Between Connolly's and Drew's versions of what occurred after the traffic stop and during the field sobriety tests, and taking into account Plante's depiction of the field tests as incorrectly administered, there exists a dispute over whether Drew drove erratically, whether and to what extent Drew admitted recent consumption of alcohol, and whether Drew performed inadequately on the field sobriety tests. That Connolly detected the scent of alcohol in Drew's truck is undisputed, as is the fact that Connolly did not believe that Drew had glassy or bloodshot eyes, a flushed face, slurred speech, an inability to understand instructions, or a combative disposition. The extent of the disputed facts regarding Drew's conduct and Connolly's observations make summary judgment on Drew's false arrest claim inappropriate. *Compare Wilk*, 296 F. Supp. 2d at 247 (summary judgment appropriate because there are no disputed issues of material fact as to the totality of the circumstances as available to the arresting officer at the time of the arrest); *Clynch*, 285 F. Supp. 2d at 226 (summary judgment appropriate because "no reasonable jury could find lack of probable cause where it is undisputed that the individual demonstrates to the arresting officer an

13

inability to perform moving field sobriety tests, smells of alcohol, slurs his speech, and admits to recent consumption of alcohol").

Here, a reasonable jury could credit Drew's account of the facts surrounding the traffic stop and his performance on the sobriety tests, as well as his expert's criticism of the manner in which Connolly conducted those tests. A jury could therefore find either that Drew did not fail the field sobriety tests or that they were incorrectly administered. In light of this factual dispute as to the pertinent events and knowledge of Officer Connolly, the question of whether probable cause existed to arrest Drew cannot be resolved as a matter of law on summary judgment. *See Wilk*, 296 F. Supp. 2d at 246. Defendants' motion for summary judgment on Drew's claim that he was arrested without probable cause is therefore denied.

### C. License Seizure/Due Process

Defendants argue that they are entitled to summary judgment in their favor on Drew's claim that he was "deprived of his right to operate a motor vehicle when the police unlawfully seized his operator's license" because Drew's license was never suspended but merely held for twenty–four hours, he had an adequate post–deprivation remedy in that he was entitled to a hearing, and it was reasonable for Officer Connolly to hold Drew's license for twenty–four hours because he suspected that Drew might be under the influence of something other than alcohol.[2]

---

[2] Defendants, in moving for summary judgment on this issue, stylize Drew's claim that he was deprived of his right to drive (Am. Compl. ¶ 13) as a due process claim. Although Drew complains that he was deprived his right to drive "as a further result" of the Fourth and Fourteenth Amendment violations committed by Connolly in stopping him without reasonable suspicion and arresting him without probable cause, he does not specifically stylize his claim that he was deprived of his right to drive as a due process claim

14

"[D]ue process ordinarily requires an opportunity for 'some kind of hearing' prior to the deprivation of a significant property interest." *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 299 (1981). Defendants argue that even if Connolly's seizure of his license violated Conn. Gen. Stat. § 14-227b, as Chief Giulini suggested in his deposition (Giulini Dep. at 36:24–38:23), this did not amount to a violation of due process because a deprivation of liberty or property through the random or unauthorized conduct of a state employee does not violate due process so long as the state provides an adequate post–deprivation remedy. *See Hudson v. Palmer*, 468 U.S. 517, 534–35 (1984). It is not clear from these facts, however, that Drew was provided with an adequate post–deprivation remedy. Giulini testified that Drew was not informed that he could retrieve his license twenty–four hours later, and that he did not get his license back until five days after the arrest. (Giulini Dep. at 38:16–39:23.) Defendants point to no other remedy available to Drew after Connolly seized his license.

The Connecticut Appellate Court in *State v. Washburn*, 34 Conn. App. 557, 565–66 (1994), held that Conn. Gen. Stat. § 14-227b, in providing for a 24–hour license suspension without a pre–suspension hearing, does not violate federal due process rights insofar as the right to operate a motor vehicle is not significantly infringed by a 24–hour suspension and the risk of erroneous deprivation is low considering the safeguards in § 14-277b(c), including that the person whose license is suspended "first be arrested and submit to and fail or refuse to submit to a blood alcohol test." Here, however, the safeguards in § 14-277b(c)

---

in his Second Amended Complaint. Nonetheless, Drew's counsel clarified at oral argument that this claim is brought under the procedural due process guarantee of the Fourteenth Amendment.

were not complied with; Drew's license was suspended even though he neither refused nor failed a blood alcohol test or urinalysis. Because the undisputed facts do not demonstrate that Drew was provided with an adequate post–deprivation remedy and also show that Officer Connolly failed to comply with statutory procedures that protect a drunk–driving suspect from erroneous deprivation, Defendants cannot show that as a matter of law they did not violate Drew's due process rights by seizing his license for a total of five days. Defendants' motion for summary judgment in their favor on Drew's license seizure claim is therefore denied.

D. *Monell* Liability

Defendants argue that they are entitled to summary judgment on Drew's claims against the City because Drew cannot establish a constitutional violation by the individual defendants[3] and because Drew cannot present any evidence of a City policy that resulted in the alleged constitutional violations. (Mem. Supp. at 26–20.)

A municipality may be liable under Section 1983 "for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). An official municipal policy or custom can be established by showing a deliberate policy of failing to train or supervise officers where that failure "amounts to deliberate indifference

---

[3] Without a constitutional violation by one of its officers, a municipality cannot be held liable under *Monell*, *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986), however, as discussed above, Defendants are not entitled to summary judgment on Drew's claims against Officer Connolly. Accordingly, summary judgment is not appropriate on *Monell* liability based on an absence of a constitutional violation by an individual officer.

to the rights of persons with whom the police come into contact." *Anthony v. City of New York*, 339 F.3d 129, 140 (2d Cir. 2003) (citing *City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989)). Where there is no written directive or regulation that establishes the alleged policy of failing to train, it "may be inferred from the informal acts or omissions of supervisory municipal officials" where those acts are so severe as to "constitute 'gross negligence' or 'deliberate indifference' to a plaintiff's rights." *Sarus v. Rotundo*, 831 F.2d 397, 400–01 (2d Cir. 1987). A plaintiff must accordingly show:

> (1) that 'a policymaker of the municipality knows to a moral certainty that its employees will confront a given situation'; (2) that 'the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation'; and (3) that 'the wrong choice by the employee will frequently cause the deprivation of a citizen's constitutional rights.'

*Nicholson v. Scoppetta*, 344 F.3d 154, 166–67 (2d Cir. 2003) (quoting *Young v. County of Fulton*, 160 F.3d 899, 904–04 (2d Cir. 1998).

In support of his failure–to–train claim,[4] Drew relies entirely on the deposition testimony of Chief Giulini. Chief Giulini testified that the police department did not have authority to seize Drew's license and that he could see "where there is a need to incorporate more steps into a policy and procedure on operating under the influence" in that the department needed to do a better job articulating facts and circumstances contained in the reports prepared after an arrest. (Giulini Dep. at 38:11–43:1.) Giulini's concern with respect to the seizure of Drew's license and the need to improve reporting cannot, however, support

---

[4] Drew's counsel clarified at oral argument that his *Monell* claim against the City concerned only his claim regarding the seizure of his driver's license in violation of his due process rights.

an inference that the Groton Police Department failed to adequately train its Officers with respect to under what circumstances they can suspend a driver's license and what procedures they must follow. Giulini's after–the–fact conclusion that Connolly was wrong in seizing Drew's license does not bear on whether supervisory City officials were deliberately indifferent to the rights of those suspected of driving under the influence. Neither Giulini's acknowledgment of Connolly's error nor his desire to see improved reporting procedures demonstrate or suggest that he knew that officers would be confronted with difficult choices in deciding whether or not to suspend a driver's license for 24 hours and that a wrong choice by those officers would frequently cause the deprivation of due process rights. *See Nicholson*, 344 F.3d at 166–67.

Despite the evidence in this case that Connolly may have made the wrong decision in electing to suspend Drew's license, Drew does not point to any fact in the record that suggests that this is a difficult choice that officers frequently face or even that the City officials regularly fail to train officers on the suspension criteria in Conn. Gen. Stat. § 14-277b. Giulini's admission with respect to the need to incorporate more steps into the City's policy and procedure bears only on the department's need for more accurate reporting after arrests, not on the need to make more accurate decision with respect to license suspension. Because the undisputed facts, construed in the light most favorable to Drew, demonstrate that he does not have evidence to support a viable failure–to–train claim against the City, Defendants motion for summary judgment with respect to this claim is granted.

E. Qualified Immunity

Defendants also argue that the individual defendants are entitled to summary judgment under the doctrine of qualified immunity because Officer Connolly's actions were objectively reasonable.

"A police officer is entitled to qualified immunity shielding him or her from a claim for damages for false arrest where (1) it was objectively reasonable for the officer to believe there was probable cause to make the arrest, or (2) reasonably competent police officers could disagree as to whether there was probable cause to arrest." *Ricciuti v. New York City Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997). "[O]n summary judgment, where all facts must be viewed in the light most favorable to the non-moving party, for the purpose of qualified immunity and arguable probable cause, police officers are entitled to draw reasonable inferences from the facts they possess at the time of a seizure based upon their own experiences." *Cerrone v. Brown*, 246 F.3d 194, 203 (2d Cir. 2001). With respect to Drew's arrest, the facts as viewed in the light most favorable to Drew, demonstrate that it was not objectively reasonable for Connolly to believe that there was probable cause to arrest Drew for driving while under the influence, as discussed above. Because of the dispute as to what the facts available to Connolly at the time of the traffic stop and arrest actually were, Defendants motion for summary judgment in favor of Officer Connolly under the doctrine of qualified immunity is denied.

III.    Conclusion

For the reasons stated above, Defendants Motion for Summary Judgment [Doc. #62] is GRANTED in part and DENIED in part.  Plaintiff's claims against the City of Groton are dismissed.  All other claims remain for adjudication.

IT IS SO ORDERED.

/s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 21st day of July, 2011.